UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JORDAN BROWN and CRYSTAL BROWN, | ) )  ) |
| Plaintiffs, | ) ) |
| vs. | )   CAUSE NO.  1:07-cv-1466-WTL-TAB ) |
| INDIANAPOLIS METROPOLITAN POLICE DEPARTMENT and JEFFREY B. PATTERSON, | ) ) ) ) |
| Defendants. | ) ) |

**ENTRY ON MOTION TO AMEND COMPLAINT AND
MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Plaintiffs' motion to amend their complaint and the

Defendants' motion for summary judgment.  Both motions are fully briefed and the Court, being

duly advised, **GRANTS** the Plaintiffs' motion and **GRANTS IN PART** the Defendants' motion

for the reasons set forth below.  In addition, the Court declines to exercise supplemental

jurisdiction over the remainder of the case and orders the case remanded to the Marion Superior

Court.

**Plaintiffs' Motion to Amend**

This case arises out of the arrest of Plaintiff Jordan Brown, who is the son of Plaintiff

Crystal Brown, for the murder of Roderick Garrett.  The particular factual allegations are

discussed in detail below in conjunction with the ruling on the Defendants' motion for summary

judgment.  Suffice it to say at this point that Jordan, who was seventeen-years-old at the time,

was arrested in October 2005 and held in jail for approximately four months.  At all times Jordan

vigorously denied that he was involved in, or indeed anywhere near the scene of, the murder, and

in January 2006 his attorney filed a notice of alibi defense on his behalf.  Jordan was released

from detention on February 23, 2006, but was required to wear a GPS ankle bracelet as a

condition of that release.  The charges against him were dropped by the prosecutor on May 15,

2006, after it was determined that it was another person named Jordan, not the Plaintiff, who had

been involved in the murder. His arrest record subsequently was expunged.

The Plaintiffs' original complaint contains a paragraph entitled "Liability Theories"

which reads as follows:

> That this is an action for money damages pursuant to 42 U.S.C. §§ 1983 and
> 1988, and the Fourth and Fourteenth Amendments to the United States
> Constitution.  Further, Plaintiff is seeking damages for:
>
> a.   Defendants' failing to conduct a proper investigation;
> b.   Defendants' excessive, unreasonable and unjustified use of force against Jordan;
> c.   Defendants' intentional infliction of emotional distress against Jordan and
>      Crystal.

The complaint continues with the following factual allegations:

- Jordan's arrest "was effectuated with excessive, unreasonable, and unjustified

  force against his person, which violated [his] well settled constitutional rights";

- the "reckless investigation and/or intentional failure to investigate Jordan's

  involvement in the homicide of Roderick Garrett" violated his rights under the

  Fourth and Fourteenth Amendments;

- "during Jordan's incarceration he was repeatedly pressured to confess to

  involvement in the murder of Roderick Garrett; and, that during this process he

  was subject[ed] to both physical abuse and psychological intimidation" which

  constituted the reckless and/or intentional infliction of emotional distress upon

  him;

2

- the IMPD "released information to the press that Jordan was arrested for his involvement in the murder of Roderick Garrett for the purposes of defaming him in the eyes of the public";

- the requirement that Jordan wear a GPS ankle bracelet upon his release also constituted defamation;

- Plaintiff Crystal Brown suffered emotional distress and the loss of Jordan's services as a result of "the reckless and/or intentional failure to investigate Jordan's involvement in the homicide of Roderick Garrett."

The Defendants filed their motion for summary judgment on November 14, 2008, one day prior to the dispositive motions deadline.  On December 15, 2008, the Plaintiffs sought an extension of time to January 14, 2009, to file their response to the summary judgment motion. The basis for the requested extension was that the Defendants had belatedly (by several months) served their discovery responses on October 11, 2008, and that the responses "were simply placed en masse in file folders and were not organized or categorized in any immediately discernable manner"; therefore, the Plaintiffs required additional time to review the documents, obtain affidavits, and determine what depositions to take.  The Magistrate Judge assigned to this case granted the Plaintiffs until January 5, 2009, to file their summary judgment response.

In the meantime, the Plaintiffs filed the instant motion seeking to amend their complaint. The motion was in part a response to the summary judgment motion, in that the Defendants argued in their motion that one of the named Defendants, the Indianapolis Metropolitan Police Department ("IMPD"), was not a suable entity, and the Plaintiffs' proposed amended complaint replaced the IMPD with the City of Indianapolis.  The Plaintiffs' proposed amendment also

3

recast the legal theories upon which they were relying. Specifically, the proposed amended complaint asserts the following claims:

- Count I:   The Defendants violated Jordan's Fourth Amendment rights by falsely arresting him without probable cause and continued his unlawful incarceration even after his release by requiring him to wear a GPS ankle bracelet;

- Count II: The Defendants defamed Jordan by releasing his "name and photo to the media as having been arrested for involvement in the murder of Roderick Garrett" and continued to defame him by requiring him to wear a GPS ankle bracelet after his release;

- Count III:  The Defendants negligently and/or intentionally inflicted emotional distress on both Jordan and his mother by falsely arresting him and unlawfully detaining him for an excessive period of time; these actions violated his Fourth Amendment rights and also constituted the state law torts of false arrest and unlawful detention.

The Defendants object to the Plaintiffs' motion to amend their complaint on several grounds.  First, with regard to the substitution of the City of Indianapolis for the IMPD, the Defendants argue that any claim against the City would be barred by the statute of limitations because the amendment would not "relate back" to the original complaint.  The Defendants are correct that Federal Rule of Civil Procedure Rule 15(c)(3) "permits an amendment to relate back only where there has been an error made concerning the identity of the proper party and where that party is chargeable with knowledge of the mistake, but it does not permit relation back where there is a lack of knowledge of the proper party."  *Hall v. Norfolk Southern Ry. Co.*, 469

F.3d 590, 596 (7th Cir. 2006) (citation omitted).  However, the Court disagrees that this is a case in which the plaintiff lacked knowledge of the proper defendant.  Rather, the original complaint makes it clear that the Plaintiffs intended to sue the governmental entity that employed Defendant Patterson.  The Plaintiffs' mistake was not realizing that in order to do so, they needed to sue the City of Indianapolis because the police department itself is not a suable entity. This is the type of mistake which may be corrected by an amendment that "relates back" pursuant to Rule 15(c)(3).

The Defendants also object to the other changes contained in the Plaintiffs' proposed amended complaint on the ground that they will be prejudiced if the Plaintiffs are permitted to assert new claims at this stage of the litigation. However, under the federal notice pleading standard it is not necessary for the plaintiff to set forth his legal theories in his complaint.  *Aaron v. Mahl*, 550 F.3d 659, 666 (7th Cir. 2008).  Therefore, as long as the complaint is adequate to put the defendant on notice of a particular claim, a plaintiff may articulate a particular legal theory at the summary judgment stage.  *O'Grady v. Village of Libertyville*, 304 F.3d 719, 723 (7th Cir. 2002).  In this case the Plaintiffs are simply relying upon the assertions in the original complaint to support some new legal theories that are articulated in the amended complaint; the Defendants are not prejudiced by having to respond to those theories.  Accordingly, the Plaintiffs' motion to amend their complaint is **GRANTED**.

### Defendants' Motion for Summary Judgment

As noted above, the Defendants' motion for summary judgment was filed prior to the Plaintiffs' motion to amend their complaint, and therefore was directed to the original complaint rather than the amended complaint.  However, to the extent relevant to this ruling, the issues

5

raised in the Defendants' motion and the Plaintiffs' responses thereto are entirely transferable to the amended complaint.  Therefore, the Court has considered the motion for summary judgment as it relates to the amended complaint and, being duly advised, now rules accordingly.

### Ripeness of the Motion

The Plaintiffs sought and were granted an extension of time to respond to the instant motion for summary judgment and then filed a timely response.  In addition to a substantive response to the arguments raised in the motion, the Plaintiffs argue in their response that the motion for summary judgment was "premature" because of "the recent receipt of the voluminous discovery and the fact that many of the requested documents have not been provided by the Defendants."  Plaintiffs' Response at 9.  This characterization of the motion as "premature" is curious in light of the fact that the motion was filed just one day prior to the deadline for dispositive motions.  Further, while the Defendants clearly were dilatory in responding to the Plaintiffs' discovery requests, and the Plaintiffs had raised that issue during a pretrial conference held by Magistrate Judge Baker on July 23, 2008, the Plaintiffs did not file a motion to compel or otherwise bring any discovery issues to the attention of the Court in the almost four months between that conference and the date the summary judgment motion was filed.

If, in fact, the Plaintiffs needed additional discovery before they could prepare a complete response to the summary judgment motion, Federal Rule of Civil Procedure 56(f) provided the proper mechanism for addressing that issue.  Specifically, Rule 56(f) states that a court may deny a summary judgment motion or give the responding party additional time if the party "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition." The Plaintiffs did not submit such an affidavit in this case.  However, the Plaintiffs' response

does contain the following statement:

> Discovery has not been completed in this case. In response to
> many of Plaintiffs' Requests for Production, Defendants refused to
> supply the requested documents using the inane excuse that "Indianapolis Metropolitan Police
> Department was not created until January 1, 2007". In fact, the Plaintiffs have ongoing discovery
> concerning:

> (1)   The voluntary statement given by Jordan Brown prior to his
>       arrest;

> (2)   The Plaintiffs are in the process of locating three (3) witnesses to
>       ascertain Affidavits regarding critical evidence relating to the
>       credibility of the two (2) witnesses who identified  Jordan Brown
>       and the surrounding circumstances;

> (3)   The statement of the surviving shooting victim taken by Detective
>       Patterson on July 13, 2005;

> (4)   the videotape taken the night of the murder of the cars involved in
>       the shooting referenced by Detective Paterson during the voluntary
>       statement of Robert Grundy . . . ; and

> [5]   Any additional requests necessitated by justice as the Plaintiffs
>       continue to receive previously requested discovery and review it.

Response at 7.  It is unclear whether the Plaintiffs intended by this statement to invoke Rule

56(f); if they did, their attempt failed both procedurally and substantively.  Procedurally, it is not

accompanied by the required affidavit and no explicit Rule 56(f) request is made; substantively,

it fails to identify with particularity the discovery the Plaintiffs need and how that discovery is

relevant to the issues raised in the motion for summary judgment.  *See, e.g., American Needle

Inc. v. National Football League,* 538 F.3d 736, 740-41 (7th Cir. 2008) (reiterating need for Rule

56(f) movant to identify with specificity the discovery sought and how it relates to the pending

summary judgment motion).  Finally, the Court notes that the Plaintiffs' response to the instant

motion was filed on January 5, 2009, and the Plaintiffs have neither sought to supplement that

response nor sought the Court's assistance in obtaining discovery during the intervening months.

Indeed, the Court held a status conference on February 25, 2009, at which time the only

discovery issue raised by the Plaintiffs was their desire to view some videotapes, which the

Defendants indicated were available for review in defense counsel's office.  Accordingly, the

Court determines that the motion for summary judgment is ripe for resolution.

### *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if

"the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  In ruling on a motion for summary judgment,

the admissible evidence presented by the non-moving party must be believed and all reasonable

inferences must be drawn in the non-movant's favor.  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th

Cir. 2009).  However, "[a] party who bears the burden of proof on a particular issue may not rest

on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is

a genuine issue of material fact that requires trial."  *Hemsworth v. Quotesmith.com, Inc.*, 476

F.3d 487, 490 (7th Cir. 2007).  Finally, the non-moving party bears the burden of specifically

identifying the relevant evidence of record, and "the court is not required to scour the record in

search of evidence to defeat a motion for summary judgment."  *Ritchie v. Glidden Co.*, 242 F.3d

713, 723 (7th Cir. 2001).

## *Material Facts*

The facts of record as viewed in the light most favorable to the Plaintiffs are as follow.[1]
On July 11, 2005, a drive-by shooting occurred in front of a house on State Street in Indianapolis
which resulted in the death of fifteen-year-old Roderick Garrett and injury to another teenager,
Heather Baldock.  The shooting followed two incidents earlier that night which apparently were
part of an ongoing feud between two groups of young people, at least some of whom were
current and former Arsenal Tech High School students:  the "Kingside" group and the "Hillside"
group.  In one incident Garrett and Lawrence Parker, who were members of the Kingside group,
were chased by people traveling in several vehicles, including a blue car and a green car.  In the
other, Heather Baldock and another girl were yelled at by a group of girls riding in a van; a white
car and a blue car were also involved in this alteration.

Witnesses Michael and Tracey Wiarek, who were Heather Baldock's parents, told
investigators that they heard gunshots while they were sitting on their porch about one block
from where the shooting occurred.  Immediately before they heard the gunshots they had seen
several vehicles, including a blue car, a white Ford Mustang, a van, and another vehicle, stop on
the street near their house.  Two black males got out of the blue car and the white Mustang; the
two exchanged something, got back into the cars, and drove away.

On the day after the shooting, a man named Timothy Parker voluntarily gave a statement
to Detective Patterson in which he stated that he had driven his girlfriend's white Ford Mustang
from Columbus, Indiana, to Indianapolis several days earlier, that he had spent those days doing

---

[1]The Court notes that the Plaintiffs do not directly respond to the Defendants' statement
of material facts and do not directly refute any of the facts alleged by the Defendants.

cocaine, and that on the afternoon of the shooting he had "rented" the Mustang out in order to raise gas money to return home to Columbus.  Afterwards he had heard from people in the neighborhood that the car had been involved in a drive-by shooting, which had prompted him to contact the police.  He stated that he had rented the car to a man with the nicknames "Cow" and "Man-man"; he believed that his real name was Kenny Knolls, and he knew that his mother's name was Loretta Scott.  With Cow at the time was a light-skinned young man who was about six feet tall.  Parker did not know the young man's name, but he knew that he was Cow's cousin, the son of Cow's Aunt Elaine, and that he lived with Cow.  Around 11:30 p.m. that night the car was returned to him.  Cow was not in the car at that time; rather, it was occupied by Cow's cousin and another person whose name Parker did not know, but whom he knew drove a white Caprice that was usually parked in Cow's back yard.  With them at the time were four teenaged black girls who were driving in a small gray car.

A witness to the drive-by shooting told investigators that gunshots had been fired from a blue car belonging to a man called "T-man," who was also known as Tyler.  Detective Patterson determined that "T-man" was a man named Tyler Ferguson who drove a blue Chevrolet Caprice owned by his grandmother.  Detective Patterson also learned from witnesses that a person named Don, also known as "Tank," was also in one of the vehicles involved in the shooting.  From sources at Arsenal Tech High School, Detective Patterson learned that "Tank" was Dondiego Rhoades.

Detective Patterson interviewed Rhoades on October 6, 2005.  Rhoades stated that on the day of the shooting he had been driving around in a van with a person named Darron Crowe and some others, including his stepsister Alicia.  He was following a green car driven by a Robert

Grundy.  At some point they saw a blue Chevy driven by Tyler Ferguson and Crowe told

Rhoades to pull over.  Crowe got out of the van and Rhoades saw a person named Jordan, whom

Rhoades did not know, give Crowe a gun.  Crowe then got into the blue Chevy and Jordan got

into another car.  Rhoades then drove the van to Alicia's house.  After awhile the others arrived

at Alicia's house in the blue Caprice and the green car; Jordan also arrived in a white Mustang.

Crowe later told Rhoades that he had shot Garrett.

Detective Patterson interviewed Tyler Ferguson on October 18, 2005.  Ferguson told him

that on the day of the shooting he was at Crowe's mother's house along with several other

individuals, including a black male named Jordan, whom Ferguson did not know.  Jordan had

arrived in a white Mustang.  When some members of the Kingside group drove by, they all got

into their vehicles and drove around looking for the Kingside car.  Ferguson stated that in

addition to the white Mustang the group rode in vehicles including Ferguson's blue Caprice,

Robert Grundy's green car, and a van driven by "Don."  They saw some members of the

Kingside group walking and got out of their cars to fight them, but the Kingside boys [identified

by Lawrence Parker as himself and Garrett] ran away.  Crowe got into the back seat of

Ferguson's car. They drove some more and yelled at a couple of girls walking down the street

[identified by Heather Baldock as herself and a friend].  They then drove past the State Street

residence and Crowe fired a gun toward the people who were in front of the house.  After the

shooting, Crowe told Ferguson that he needed to give the gun back to Jordan, and in fact

Ferguson saw Crowe return the gun to Jordan at Crowe's mother's house.

Ferguson reviewed a photo array that contained 24 photographs of black males named

Jordan who were between the ages of 15 and 21.  Ferguson identified a photo of Jordan Brown

as the person to whom Crowe gave the gun after the shooting.

On October 19, 2005, Detective Patterson interviewed Christopher Dudley, whom Ferguson had identified as a passenger in his car on the day of the shooting.  Dudley's account of the events of the day was consistent with Ferguson's.  Dudley stated that he saw someone give a gun to another person who then got into Ferguson's car and ultimately fired the shots at the State Street house.  Dudley was not acquainted with either the shooter or the person who supplied the gun.  When shown a six-person photo array, Dudley identified Jordan Brown as the person who supplied the gun; when shown a high school yearbook, he identified Crowe as the shooter.

Based upon the information set forth above, Detective Patterson prepared a probable cause affidavit and presented it to the Marion County Prosecutor's Office seeking to obtain criminal charges against and arrest warrants for Darron Crowe and Jordan Brown.  The probable cause affidavit did not mention the interview of Timothy Parker or any information Parker provided.  A deputy prosecutor reviewed the affidavit and advised Detective Patterson that probable cause existed for the arrests.  On October 28, 2005, Jordan was arrested at his home in Speedway, Indiana, by Speedway police officers and transported to the Indianapolis Police Department for questioning.  Jordan, who did not attend Arsenal Tech High School and lived in a different part of the Indianapolis area, was questioned and denied any involvement in the drive-by shooting.  Although the arrest warrant Detective Patterson had requested was not yet active, he believed there was probable cause to arrest Jordan and therefore he placed him under arrest.  A court subsequently ordered Jordan to be held without bail.  Jordan was held in jail until February 23, 2006.

In the meantime, on January 11, 2006, Jordan's attorney filed a Notice of Alibi Defense.

12

Detective Patterson also learned that Jordan's attorney alleged that Jordan had been mistaken by the witnesses for an individual named Jordan Matthews, and that Jordan Matthews was the person who had given the gun to Crowe.  Detective Patterson showed Christopher Dudley a photo array that included Jordan Matthews; Dudley did not identify Matthews as the supplier of the gun.  Detective Patterson also followed up with Timothy Parker.  Parker was shown two photo arrays, one containing Jordan Brown and the other containing Jordan Matthews and asked whether any of the individuals in the photographs had been with Cow when he rented the Mustang.  Parker identified both Jordans as possibilities, stating that it could be either of them but they looked so similar that he could not determine which one it was from photographs.  After viewing a live line-up that included both Jordans, Parker identified Jordan Matthews as having been around the Mustang on the day of the shooting.  Detective Patterson re-interviewed additional witnesses and found more evidence suggesting that it was Jordan Matthews, not Jordan Brown, who had been involved in the shooting.  Based on this new evidence, as well as Jordan Brown's alibi witnesses, the prosecutor agreed not to oppose Jordan Brown's request that he be released on bail in late February 2006.  The court released him but required that he wear a GPS ankle bracelet.  In May 2006 the charges against Jordan Brown were dismissed; his record eventually was expunged.

### *Discussion*

#### *Failure to Plead "Under Color of State Law"*

The Defendants first argue[2] that the Plaintiffs' complaint fails to state a claim under 42

---

[2]Actually, the first argument in the Defendants' brief in support of their motion is that IMPD is not a suable entity.  That argument has been mooted by the amendment of the Plaintiffs' complaint to name the City of Indianapolis.

U.S.C. § 1983 because it does not allege that Detective Patterson acted under color of state law.[3]

It is true that § 1983 liability attaches only to actions taken under the color of state law.

However, contrary to the Defendants' argument, the failure to include those magic words does

not render a complaint insufficient.  Both the original and the amended complaints clearly assert

that Detective Patterson acted at all times in his capacity as a detective for the Indianapolis

Police Department; this is sufficient to state a claim under § 1983 even in the absence of an

express statement that his actions were taken under the color of state law.

*§ 1983 Claim Against the City of Indianapolis*

The Defendants next argue that the Plaintiffs cannot maintain their § 1983 claim against

the City of Indianapolis because there is no evidence that any violation of Jordan's rights was

caused by an official policy or custom of the City.  The Defendants are correct that a

governmental entity may not be held liable for unconstitutional acts under a *respondeat superior*

theory, but rather are liable for those acts only if they were carried out pursuant to an official

custom or policy.  *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Lewis

v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (citation omitted) ("Misbehaving

employees are responsible for their own conduct, units of local government are responsible only

for their policies rather than misconduct by their workers.").  Therefore, in order to survive

summary judgment on a § 1983 claim against a governmental entity like a city, a plaintiff "must

present evidence demonstrating the existence of an official policy, widespread custom, or

deliberate act of a . . . decision-maker of the municipality or department." *Grieveson v.*

_____

[3]The Court notes that the Plaintiffs also did not include this allegation in their amended
complaint.

14

*Anderson*, 538 F.3d 763, 771 (7ᵗʰ Cir. 2008) (citations and internal quotation marks omitted).  In addition, the plaintiff must show that the official policy or custom was the cause of the alleged constitutional violation-the "moving force" behind it.  *Id.*

  In this case, the Plaintiffs have failed to submit any evidence at all that would support a finding that a policy of the City of Indianapolis caused the constitutional violations they allege.  The Plaintiffs suggest that this omission was caused by the Defendants' failure to produce relevant documents when they responded to the Plaintiffs' discovery requests in October 2008.  However, as noted above, the Plaintiffs have had ample opportunity to pursue those documents since then and apparently have failed to do so.  In addition, in response to the motion for summary judgment the Plaintiffs have not even articulated what policy or custom they believe existed.  Accordingly, the City of Indianapolis is entitled to summary judgment on the Plaintiffs' § 1983 claim.

### *§ 1983 Claim Against Detective Patterson*

  The Defendants next argue that the Plaintiffs' § 1983 claim against Detective Patterson must fail because he had probable cause to arrest Jordan.  "A finding of probable cause absolutely bars a claim for false arrest under § 1983."  *Reynolds v. Jamison*, 488 F.3d 756, 765 (7ᵗʰ Cir. 2007).  The Plaintiffs argue that Detective Patterson did not have probable cause to arrest Jordan because there was "no physical, scientific or credible evidence linking Jordan Brown with the shooting" and Detective Patterson had received information from Timothy Parker that would have led him to the correct suspect if only he had followed up on it.[4]

---

  [4]The implication of the Plaintiffs' argument is that the information provided by Timothy Parker regarding the identity of the young men who returned in the white Mustang on the night of the shooting was accurate and led to Jordan Matthews; in other words, that Jordan Matthews

However, there was, in fact, credible evidence linking Jordan Brown with the shooting–the fact that two witnesses picked his photograph out of photo arrays as the person who provided the gun to Crowe immediately before the shooting and retrieved it from him afterwards.  In hindsight we know that those witness identifications were incorrect, but "the existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information," and "[i]t is largely irrelevant–for purposes of determining an arresting officer's liability–whether the person arrested is later found to be innocent."  *Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir. 2004) (citations omitted).

It is well-established that "so long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest."  *Id.* at 668-69.  The Plaintiffs have submitted no evidence to suggest that the two witnesses who identified Jordan from photo arrays were anything but reasonably credible.  Their accounts of the night's events–while varying in certain details–were entirely consistent with each other and with the numerous other witnesses interviewed by Detective Patterson. While it may be true, as the Plaintiffs point out, that they did not know the person who supplied the gun before that night, they had spent sufficient time with him that night to be able to identify him from a photograph.  Their identification of Jordan Brown provided Detective Patterson with probable cause to arrest him,[5] and that probable cause

---

is, in fact, the cousin of Kenny Knolls, aka "Cow."  The Court notes that there is no evidence in the record that establishes that fact, although there is nothing to suggest that it is incorrect, either.

[5]The Plaintiffs suggest generally that the fact that they vigorously and consistently denied that Jordan was involved in the shooting from the moment he was arrested should have prompted further investigation by Detective Patterson.  However, once an officer has probable cause to arrest a suspect, he is under no constitutional obligation to further investigate the suspect's

bars the Plaintiffs' claim for false arrest pursuant to § 1983.  Therefore, the Defendants' are entitled to summary judgment on that claim.

*State Law Claims*

The Defendants also move for summary judgment on some of the Plaintiffs' remaining claims.  This case originally was filed in Marion Superior Court and was removed to this Court by the Defendants based upon the Plaintiffs' § 1983 claim.  The Court's jurisdiction on all of the Plaintiffs' remaining claims is based upon 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over claims based upon state law that are closely related to the federal claim(s) in a case.  However, "[w]hen the federal claim in a case drops out before trial, the presumption is that the district judge will relinquish jurisdiction over any supplemental claim to the state courts."  *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008).  There are exceptions to that general rule, and the court should decide the merits of a supplemental state claim when (1) the statute of limitations has run, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is "absolutely clear" how the state claims should be decided.  *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008).  None of those exceptions apply here.  Remanding the case to Marion Superior Court will avoid any statute of limitations problems; none of this Court's resources have been expended on the state law claims, *see id.* ("the district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case"); and

---

possible innocence.  *Reynolds v. Jamison*, 488 F.3d 756, 768 (7th Cir. 2007); *see also Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 440 (7th Cir. 1986) (noting that "the report of one identified, reliable eyewitness creates probable cause" and "[t]he Court has never suggested that the police, with such information in hand, must conduct a further investigation or put contradictory evidence into the [probable cause] affidavit").

it does not appear to the Court that the proper resolution of the state law claims is so obvious as to overcome the presumption that remand is appropriate.  Accordingly, the Court declines to exercise supplemental jurisdiction over the state law claims asserted in the Plaintiffs' amended complaint.

**Conclusion**

For the reasons set forth above, the Plaintiffs' motion to amend their complaint is **GRANTED** and the amended complaint (Exhibit 1 to Docket No. 44) shall this date be entered onto this Court's docket.  Defendants' motion for summary judgment is **GRANTED** in favor of both Defendants on the Plaintiffs' § 1983 claim.  All of the remaining claims asserted in the Plaintiffs' amended complaint are based upon state law, and the Court declines to continue to exercise supplemental jurisdiction over them.  Accordingly, this case is **ORDERED REMANDED** to the Marion Superior Court.

SO ORDERED:  04/20/2009

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification